UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                     :

DAVID KRASNER,                      :
                                     :

                     <u>Plaintiff</u>.     :
                                     :               08 Civ. 8499 (GEL)

    -v.-                             :
                                     :         **OPINION AND ORDER**

HSH NORDBANK AG, and ROLAND KISER   :
in his personal and official capacities,   :
                                     :

                    <u>Defendants</u>.    :
                                     :
----------------------------------------------------------------x

Douglas H. Wigdor, Christopher Q. Davis,
Thompson Wigdor & Gilly LLP, New York, NY,
<u>for Plaintiff David Krasner</u>.

Joseph C. O'Keefe, Alychia L. Buchan,
Proskauer Rose LLP, Newark, New Jersey,
<u>for Defendant HSH Nordbank AG</u>.

David Rabinowitz, Moses & Singer LLP, New York,
NY, <u>for Defendant Roland Kiser</u>.


GERARD E. LYNCH, <u>Circuit Judge</u>:[*]

      Plaintiff David Krasner brings this action against his former employer, HSH Nordbank

AG ("HSH"), and his supervisor while employed there, Roland Kiser, alleging sexual

discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e <i>et seq.,</i> the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 <i>et</i>

<i>seq</i>., and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-101

---

[*] The Honorable Gerard E. Lynch, United States Court of Appeals for the Second
Circuit, sitting by designation.

*et seq.*[1]  Plaintiff further brings a number of state law claims against HSH contending first, that it

breached an implied employment contract by discharging him, and second, that it impermissibly

withheld his end-of-year bonus, giving rise to claims for breach of contract, breach of implied

covenant of good faith and fair dealing, unjust enrichment, quantum meruit and violation of the

New York Labor Law.  Defendants move to dismiss all claims pursuant to Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim.  For the reasons that follow, defendants' motions

will be granted.

## BACKGROUND

Defendant HSH is an international commercial bank, headquartered in Germany, and has

offices worldwide, including a branch in New York City.  (Compl. ¶ 6.)[2]  HSH's New York

branch employs approximately 200 people and, since at least October 2006, has been led by

defendant Kiser, the branch's General Manager and Chief Operating Officer.  (Id. ¶¶ 6-7.)

Plaintiff Krasner joined HSH's New York office in October 2006 as Vice President and Head of

Corporate Services.  (Id. ¶ 11.)

There, Krasner alleges, he encountered an atmosphere infected with overt sexism, where

career "advancement based on sexual favoritism" was accepted (id. ¶ 117), and where male

supervisors promoted a sexist and demeaning image of women in the workplace in which

---

[1]  Because "individuals are not subject to liability under Title VII," Patane v. Clark, 508
F.3d 106, 110 (2d Cir. 2007) (per curiam), plaintiff does not bring Title VII claims against Kiser,
and charges him only with primary violations of the NYSHRL and NYCHRL, and aiding and
abetting HSH's violations of those laws.

[2]  The following facts, taken from plaintiff's complaint, or from documents integral to it,
are construed in a light most favorable to plaintiff and assumed to be true for purposes of these
motions to dismiss.

women's advancement was governed by a "casting couch" (e.g., id. ¶¶ 96, 109). The primary offender in this narrative is Kiser, who is alleged to have "promote[ed] stereotypical, offensive, and degrading understandings of women in the workplace." (Id. ¶ 110.) For instance, in an email from Kiser to Krasner and a female co-worker named Leslie Colamaria, Kiser noted that "chicks have it so easy" because Colamaria received a number of thank you emails for doing a job that was, by implication, less worthy than a different job performed by Krasner for which he received no thank you notes. (Id.) Kiser also regularly referred to two female staff members as "chicky," and did so on a number of instances within Krasner's earshot. (Id. ¶ 112-13.) Krasner found these various references offensive, as did one of the two staffers. (Id. ¶¶ 111-13.) Kiser also pressured male subordinates, such as Krasner, to go to strip clubs with him when on business trips abroad. (Id. ¶ 114.) On one occasion, Krasner was coerced into entering a German strip club with Kiser, and witnessed Kiser engaging in sexual acts with the strippers but successfully resisted Kiser's urging that he do the same. (Id. ¶¶ 114-15.) During this experience, Krasner was "extremely offended and [was made] extremely uncomfortable by Mr. Kiser's sexist, demeaning, and coercive behavior." (Id. ¶ 116.)

Krasner's complaint does not rest on these instances alone, however, but rather their effect on the work environment when viewed in conjunction with the "culture of widespread sexual favoritism" he perceived to exist at HSH, stemming from several male managers' "open, public intimate relationships with [female] subordinates whom they later favored in the workplace." (Id. ¶ 84.) Krasner points first to an alleged relationship between Klaus Bernhard, the front office general manager, and administrative assistant Monica Yuknek who, Krasner notes, acted affectionately towards one another at company events. (Id. ¶ 85.) Further, Krasner

3

alleges, on information and belief, that Yuknek received favorable treatment in the form of enhanced job protection as a result of her relationship with Bernhard. (Id. ¶ 86.) Krasner also points to an alleged relationship between Peter Burke, a senior vice president in the finance department, and Payal Daswani, a junior administrative employee in the human resources department. Daswani is not alleged to have received any tangible job benefits as result of this relationship, though Krasner recounts one incident in which, on information and belief, Burke's wife found Daswani's sweater in his briefcase, and Burke in turn forced another subordinate female worker to cover up for his and Daswani's affair by calling his wife. (Id. ¶¶ 91-93.) This other female subordinate later emailed Krasner complaining that the office was like a "bordello." (Id. ¶ 95.)[3]

As regards office relationships too, the primary offender in Krasner's estimation is Kiser, and what takes center stage in the complaint are allegations of a relationship between Kiser and a woman named Melissa Campfield – who worked in Krasner's department and was the most junior member of the team he supervised (id. ¶ 25) – and the resulting impact on Krasner's career of his expressions of disapproval. Kiser, it is alleged, "advance[ed] and promot[ed]" Campfield's career "at the expense of the career advancement and reputations of other far more senior and qualified employees," Krasner included. (Id. ¶ 17.)

---

[3] Krasner also injects into his complaint allegations concerning two other relationships between, on the one hand, Kiser and Bernhard, and on the other, female "work subordinates" turned spouses who received preferential treatment as a result of those relationships. (Id. ¶¶ 87-90.) Neither of these relationships occurred in HSH's New York Office; however, Krasner alleges that the majority of employees in that office were aware of Kiser's and Bernahrd's history. (Id.)

In June 2007, Krasner became aware of the possibility of "an intimate and possibly sexual personal relationship" between Kiser and Campfield. (Id. ¶ 19.) Krasner strongly disapproved of this relationship, and repeatedly attempted to dissuade Kiser from pursuing it, explaining to him in private conversations that the relationship "could have a detrimental effect on the Department and, as a fiduciary, violated his duty of loyalty to the institution and presented a conflict of interest." (Id. ¶ 20.) Nevertheless, throughout the summer, in the face of Krasner's protestations, Kiser continued the relationship and, according to Krasner, engaged in "unwarranted preferential treatment" (id. ¶ 26) of Campfield, whom Krasner viewed as a "consistent underperformer" (id. ¶ 25).

For example, Kiser arranged for Campfield to attend a business trip to Germany – an unprecedented junket for someone in such a junior position – at the same time Kiser himself was there. (Id. ¶¶ 27-29.) Not surprisingly, the two spent time privately together while abroad. (Id. ¶ 29.) Additionally, Kiser facilitated Campfield's insubordination to plaintiff: in the face of Krasner's directive to his team prohibiting text messages on company blackberries Kiser and Campfield exchanged over 500 text messages in July alone. (Id. ¶¶ 21-24.) Campfield was given a separate office and a laptop computer, while similar requests by another (unnamed) female employee with more experience than Campfield were denied. (Id. ¶¶ 97-99.)[4] The reasons for the disparity did not escape this woman, who wrote, in an email to a former employee: "I guess if I want to sit in an office and have a laptop, I better start handing out some blow jobs." (Id. ¶ 97.)

_____

[4] It is unclear from the complaint whether the office and laptop allegations concern events that occurred during Krasner's tenure with HSH, or more recently. As discussed below, however, in neither circumstance would this incident bolster Krasner's case.

Kiser also gave Campfield assignments directly. For example, although Colamaria, the Director of Branch Marketing, was normally responsible for coordinating marketing-related meetings with Krasner, on one occasion, Kiser asked Campfield to coordinate such a meeting. (<u>Id</u>. ¶ 25.) In another instance, just prior to the Labor Day holiday weekend, Kiser asked Campfield to organize a company golf outing, despite the fact that Krasner and Colamaria were ordinarily responsible for supervising and organizing this type of event. (<u>Id</u>. ¶ 30.) Not believing Campfield to be competent for such a "high profile task," Krasner asked Kiser to reconsider this assignment. (<u>Id</u>. ¶ 31.) Kiser agreed to defer to Krasner on this matter; however, Krasner ultimately decided not to reassign the project. Nevertheless, after Campfield independently decided that her schedule was too full to take on this task, Kiser berated Krasner for "telling [Campfield] she couldn't do it" (<u>id</u>. ¶ 32), and warned Krasner that he would begin to "see a new Mr. Kiser" (<u>id</u>. ¶ 33).

Krasner was directed to come to Kiser's office at the start of the next business day, for the first glimpse of this "new" Kiser. (<u>Id</u>. ¶ 35.) Kiser told Krasner to organize a departmental meeting to address the "turbulence" caused by his leadership. (<u>Id</u>. ¶ 36.) Krasner viewed this call to hold a meeting – which ultimately never came to pass – as an "empty and retaliatory" threat. (<u>Id</u>. ¶ 38.) Although the meeting never occurred, Kiser's attacks on Krasner continued over the next few days, with Kiser accusing Krasner of running a dysfunctional department and calling him the "laughing-stock of the company." (<u>Id</u>. ¶ 39.) These words stood in stark contrast to Kiser's praise for Krasner just a week earlier for his role in raising the department's reputation. (<u>Id</u>. ¶¶ 14, 39.)

At that point, in the face of escalating unpleasantness, Krasner decided to apprise the human resources department of Kiser's "illicit sexual relationship with a subordinate." (Id. ¶ 45.) First, on September 6, 2007, Krasner lodged a verbal, in-person complaint with Ruth von Kistowsky, the Head of Human Resources, articulating his belief that "Kiser was violating [HSH's] ethics policy by creating a personal conflict of interest" and generally "creating an unprofessional environment." (Id. ¶¶ 40-41.) Krasner further asked von Kistowsky to inform Kiser of the complaint and to advise him to avoid any hostile or retaliatory gestures towards Krasner. (Id. ¶ 44.) Von Kistowsky told Krasner that she could "not imagine someone being in a worse situation." (Id. ¶ 42.)

Following Krasner's oral complaint, Kiser emailed Krasner in an effort to attempt to influence Krasner's decision to expose the relationship. (Id. ¶ 45.)[5] Thereafter, Kiser announced a restructuring of Corporate Services, creating a new department and transferring all marketing functions previously assigned to Krasner – including supervision of Campfield and Colamaria – to Kiser's direct command. (Id. ¶ 46.)

The next day, on September 19, Krasner again turned to the Human Resources department, this time with a written complaint, reiterating his belief that Kiser was violating the company's ethics policy and creating an unprofessional environment through his relationship with Campfield. (Id. ¶¶ 47-48; Karnofsky Decl. Ex. C.) This eight-page document did not raise any issues concerning Kiser's alleged transgressions beyond those related to the preferential treatment bestowed on Campfield, nor did it address any other office romances. (See Karnofsky Decl. Ex. C.)

---

[5] Krasner leaves the content and tenor of this email to the imagination.

Upon learning of this written complaint, Kiser immediately sought Colamaria's help in "tak[ing] care" of Krasner, a project in which Colamaria declined to participate. (Compl. ¶¶ 49-51.) From that point on, Krasner's situation at HSH worsened. He was only allowed to meet with Kiser when chaperoned by in-house counsel; was subjected to "humiliating scrutiny" of his work, including being required to provide printed and bound documentation of work product to Kiser; was not given any substantive work assignments; was excluded from major meetings; and was on the receiving end of an expansion of a planned internal audit ordered by Kiser to departments under Krasner's jurisdiction. (Id. ¶¶ 61-64, 66.)

On October 3, HSH concluded its internal investigation of Krasner's complaints and found no violation of law or internal ethics policy. (Id. ¶ 67.) A month later, on November 5, 2007, Krasner was summarily terminated, along with Colamaria, without any advance warning or explanation. (Id. ¶¶ 51-52, 70, 81-82.) Krasner was later told that his termination resulted from a combination of (1) the reduction of his responsibilities following the restructuring; (2) the failure to work satisfactorily with Kiser; (3) insubordination to Kiser; and (4) overall failure of performance. (Id. ¶ 71.) Krasner contends that these stated reasons were pretexts for Kiser's retaliation for exposing the Campfield relationship. (See id. ¶¶ 72-76.) This retaliation, Krasner alleges, is in violation of federal, state and city law, as well as of the company's own Code of Ethics, which was in place at all times during his tenure with HSH. (Id. ¶¶ 76-77.) According to Krasner, HSH's Code of Ethics prohibited it from firing an employee in retaliation for making any good faith ethical complaint. (Id. ¶ 76.) Wrongfully terminated or not, Krasner departed HSH without receipt of the discretionary $150,000 bonus payment that Kiser had promised him for successfully achieving his performance target for the fiscal year 2007. (Id. ¶ 80.)

Krasner subsequently sought and received a right to sue letter from the Equal

Employment Opportunity Commission ("EEOC") and thereafter commenced this lawsuit for

discrimination, retaliation, wrongful termination and withholding of his bonus.  (Id. ¶ 8.)

Defendants – HSH and Kiser – move to dismiss.

## DISCUSSION

**I.     Motion to Dismiss Standard**

A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules

of Civil Procedure tests the legal sufficiency of plaintiff's claim for relief.  See Patane, 508 F.3d

at 111-12.  In considering the legal sufficiency, a court must accept as true all well-pleaded facts

in the complaint and draw all reasonable inferences in plaintiff's favor.  ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  This presumption of truth, however, does not

extend to legal conclusions.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).  Although a

motion to dismiss is generally limited to the facts presented in the complaint, documents that are

"integral" to the complaint may also be considered, even if neither physically attached to, nor

incorporated by reference into, the complaint.  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d

Cir. 2006), quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2001).

To survive a motion to dismiss, a plaintiff alleging employment discrimination or

retaliation is not required to plead facts sufficient to establish a *prima facie* case.  Swierkiewicz

v. Sorema N.A., 534 U.S. 506, 508, 515 (2002) (setting rule for Title VII discrimination claim);

Williams v. New York City Hous. Auth., 458 F.3d 67, 72 (2d Cir. 2006) (per curiam) (finding

Swierkiewicz's holding equally applicable to retaliation claims).  Rather, the "ordinary rules for

assessing the sufficiency of a complaint" under Federal Rule of Civil Procedure 8(a)'s notice

pleading standard applies. Swierkiewicz, 534 U.S. at 511 (2002); Kassner v. 2nd Ave. Deli. Inc.,

496 F.3d 229, 237, 241 (2d Cir. 2007). This requires only a "short and plain statement of the

claim," Fed. R. Civ. Pro. 8(a), with sufficient factual "heft 'to sho[w] that the pleader is entitled

to relief.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007) (alteration in original),

quoting Fed. R. Civ. P. 8(a); accord, Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).

Under this standard, to survive a motion to dismiss, plaintiff's "[f]actual allegations must be

enough to raise a right of relief above the speculative level," id. at 555, and present claims that

are "plausible on [their] face," id. at 570. "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

Iqbal, 129 S. Ct. at 1949. "Where a complaint pleads facts that are 'merely consistent with' a

defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement

to relief." Id. (some internal quotation marks omitted), quoting Twombly, 550 U.S. at 557.

Ultimately, "when the allegations in a complaint, however true, could not raise a claim of

entitlement to relief," Twombly, 550 U.S. at 558, or where a plaintiff has "not nudged [his]

claims across the line from conceivable to plausible, the[] complaint must be dismissed," id. at

570.

## II.    Title VII Discrimination Claim

The substantive anti-discrimination provision of Title VII prohibits employers from

"discriminat[ing] against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

"One form of gender discrimination prohibited by Title VII is sexual harassment that results in a

'hostile or abusive work environment.'" Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136

F.3d 276, 289 (2d Cir. 1998), quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66

(1986). Under this doctrine, even if an "employee does not experience a specific negative

action," he may have a viable claim under Title VII for sexual discrimination where "the

harassment is so pervasive that it changes the conditions of employment." Bartinak v. Cushman

& Wakefield, Inc., 223 F. Supp. 2d 524, 528 (S.D.N.Y. 2002).

> To state a claim for hostile work environment in violation of Title
> VII, a plaintiff must plead facts that would tend to show the
> complained of conduct: (1) is objectively severe or pervasive – that
> is, creates an environment that a reasonable person would find
> hostile or abusive; (2) creates an environment that the plaintiff
> subjectively perceives as hostile or abusive; and (3) creates such an
> environment because of the plaintiff's sex.

Patane, 508 F.3d at 113 (internal quotation marks and punctuation omitted), citing Gregory v.

Daly, 243 F.3d 687, 691-92 (2d Cir. 2001). These three elements are termed, respectively, the

objective, subjective, and prohibited causal factor requirements. Brown v. Henderson, 257 F.3d

246, 252 (2d Cir. 2001); Gregory, 243 F.3d at 691-92.[6]

---

[6] There also must be a basis to hold an employer liable for a hostile environment created by its employees. Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir. 2004). Because Krasner alleges that the hostile environment was created by someone with supervisory authority over him – i.e., Kiser – to the extent Krasner otherwise stated a viable claim of discrimination, HSH could be vicariously liable. Mack v. Otis Elevator, 326 F.3d 116, 123 (2d Cir. 2003). It is not necessarily the case, however, that any hostility in the environment created by either Bernhard or Burke – who are alleged to be part of HSH's senior management, but do not appear to have had any supervisory authority over Krasner, who was also part of senior management – could be attributable to HSH vis-a-vis Krasner's discrimination claim. (Though not apparent from the complaint, HSH's motion to dismiss identifies Bernhard as the co-head of its New York branch. (D. Mem. 2).) See Mack, 326 F.3d at 123 ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct that the employer may be subject to vicarious liability. Employers are not, by contrast, vicariously liable for hostile work environment created by a mere co-worker of the victim." (internal citations, quotation marks and punctuation omitted).) It is unnecessary to resolve this issue because, as will be seen, the combined force of all the allegations of harassing conduct attributable to Kiser, Bernhard and Burke together fail to state a cognizable claim that Krasner

Krasner's discrimination claim is founded on allegations that he was subject to a sexually hostile work environment through a combination of "(1) widespread sexual favoritism resulting from Kiser's affair with Campfield; (2) widespread sexual favoritism resulting from other affairs at [HSH]; and (3) sexually harassing and offensive conduct perpetrated by Kiser . . . unrelated to sexual affairs." (P. Mem. 8-9.) In addressing these contentions, the parties argue as though a hostile environment is something that exists in some absolute way, like poisonous chemicals in the air, affecting everyone who comes in contact with it. In doing so, the parties all but ignore the prohibited causal factor requirement, which is critical to liability.

Title VII does not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are sexual in nature. Rather, it prohibits employers from discriminating against an employee (including by subjecting him or her to hostile working conditions) "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The prohibited causal factor requirement thus flows directly from the text of Title VII, and from the very essence of its nature as an *anti-discrimination* law.

It follows "that mistreatment at work, whether through subjection to a hostile environment or through such coercive deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." Brown, 257 F.3d at 252, citing Onacle v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79-80 (1998); accord, Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) ("It is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex."); Leibovitz v. New

_____

was subjected to gender discrimination.

12

York City Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001); see also Hayut v. State Univ. of New

York, 352 F.3d 733, 744-45 (2d Cir. 2003) (requiring "evidence that the alleged discrimination

was carried out because of sex" in sexual harassment claim under 42 U.S.C. § 1983, governed by

"traditional Title VII 'hostile environment' jurisprudence"); Galdieri-Ambrosini, 136 F.3d at 289

("Although the harassment need not take the form of sexual advances or explicitly sexual

conduct in order to be actionable under Title VII, the plaintiff is required to establish that the

harassment complained of was based on [his] gender.") (internal citations omitted).

The inquiry is an individualized one: "courts have consistently emphasized that the

ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of

different *groups* within the workplace." Brown, 257 F.3d at 252. "In order to show that the

allegedly harassing conduct was motivated by gender, or that gender played a motivating part in

an employment decision, a []male plaintiff must show that one of the reasons for the harassment

or the decision was that []he was a []man." Galdieri-Ambrosini, 136 F.3d at 289 (internal

quotation marks omitted). In the end, what matters is "how the employer would have treated the

plaintiff had []he been of a different sex." Brown, 257 F.3d at 254 (emphases omitted). The

prohibited causal factor requirement makes clear that a sexually "hostile environment" in the

Title VII context is not one that is bad for all living things in a manner that happens to involve

sex; rather, it is one that is *discriminatorily* hostile to an employee based on *his or her* sex.

An examination of Krasner's allegations reveals that he does not contend that he was

disparaged or badly treated or subjected to an unpleasant work atmosphere in any way because he

is a man. Rather, his complaint is primarily that Kiser and other supervisors advanced a

demeaning view of women in the workplace, which Krasner was exposed to and found

13

"objectionable" (compl. ¶ 119), and which denied "him the opportunity to work in an employment setting free of unlawful harassment" (id. ¶ 124). So, for example, Krasner believes that Kiser "encouraged sexist and demeaning treatment of women in the workplace" (id. ¶ 109) through "casual sexism" (id. ¶ 110) "which perpetuated offensive and degrading stereotypes of women" (P. Mem. 10) by calling women "chicky," and making comments such as "you chicks have it so easy. (Id.; see also compl. ¶¶ 110-13.) Similarly, Krasner objects to Kiser's pressure upon male subordinates to attend strip clubs, not because such attendance places an unfair burden on male employees, but because it "conveyed the message that women were viewed as 'sexual playthings, . . . promot[ing] offensive stereotypes of women, [and] thereby creating an atmosphere that was demeaning to women." (Compl. ¶ 125; see also P. Mem. 10, 15.) Even the allegations of "widespread sexual favoritism" through male supervisors' relationships with female subordinates reveal that this purported favoritism is alleged by Krasner to disadvantage *women* (by subjecting them to differential demands for sexual favors), not *men* (by denying them advantages open to compliant women). That is, Krasner does not allege that these relationships were harmful to men (such as himself) because his gender prevented him from receiving career advancement in exchange for sexual favors; rather, Krasner alleges that the resulting favoritism conveyed through these relationships promoted a "sexist image of women." (Compl. ¶ 96.)

Relying on an EEOC policy guidance, Krasner argues that both men and women who are offended by an environment in which women are treated as "sexual playthings" may have a hostile environment claim. (P. Mem. 9.) The EEOC takes the position that

> [i]f favoritism based on the granting of sexual favors is widespread
> in the workplace, both male and female colleagues who do not
> welcome this conduct can establish a hostile work environment in

> violation of Title VII regardless of whether any objectionable
> conduct is directed at them and regardless of whether those who
> were granted favorable treatment willingly bestowed the sexual
> favors.  In these circumstances, a message is implicitly conveyed
> that the managers view women as "sexual playthings," thereby
> creating an atmosphere that is demeaning to women.  Both men
> and women who find this offensive can establish a violation if the
> conduct is sufficiently severe or pervasive to alter the conditions of
> their employment and create an abusive working environment.

EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism, N-915.048

(Jan. 12, 1990) (hereinafter "EEOC Policy Guidance on Sexual Favoritism") (internal quotation

marks and punctuation omitted), available at http://www.eeoc.gov/policy/docs/sexualfavor.html.

To the extent the EEOC  – whose position is not binding on the courts, e.g., Kebler v. Forest

Elec. Corp., 799 F. Supp. 326, 337 n.13 (S.D.N.Y. 1992) – takes the view that an atmosphere

may be discriminatorily hostile for a man simply by virtue of its being bad for women, this Court

disagrees.  See Bermudez v. TRC Holdings, Inc., 138 F.3d 1176, 1180 (7th Cir. 1998) (noting

that the EEOC has not explained why men may recover by demonstrating that the workplace is

hostile towards women).  The Second Circuit has never endorsed such a position and this Court

sees no sound reason to.[7]  Krasner's concern for a woman's right to be free of workplace

---

[7]   Indeed, far from endorsing it, the Second Circuit has repeatedly questioned whether a
male employee would have standing to pursue such a third-party discrimination claim. Leibovitz,
252 F.3d at 186 (noting that several circuits have found prudential standing concerns to preclude
men from pursuing discrimination claims based on their opposition to discrimination against
women, but finding the issue inapposite because plaintiff, a female, was a member of the
protected class she claimed was discriminated against); see also Wimmer v. Suffolk County
Police Dep't, 176 F.3d 125, 136 n.5 (2d Cir. 1999) (noting that "it is not clear that [a white
person] would have standing to bring a Title VII" claim that the work environment was hostile to
minority employees), citing Bermudez, 138 F.3d at 1180.  Cases endorsing the form of
widespread sexual favoritism liability countenanced by the EEOC position have involved female
plaintiffs.  See, e.g., Miller v. Dep't of Corr., 36 Cal. 4th 446 (2005) (relying on EEOC policy
guidance in addressing claim of discrimination under the California Fair Employment and
Housing Act); Broderick v. Ruder, 685 F. Supp. 1269 (D.D.C. 1988).  Krasner cites no case, nor

discrimination, and offense taken upon being surrounded by conduct believed to impinge on that right, admirable as it may be, does not make Krasner himself a victim of gender-based discrimination within the scope of Title VII's protections. Stoner v. New York City Ballet Co., No. 99 Civ. 196, 2002 WL 523270, at *20-21 (S.D.N.Y. Apr. 8, 2002) ("Plaintiff's allegations that Fader and others harassed *women* working for the Ballet's orchestra do not support his claim because they fail to allege specific acts to support a claim that the work environment was hostile towards men, like Stoner."), citing Smith v. AVSC Int'l, Inc., 148 F. Supp. 2d 302, 311 (S.D.N.Y. 2001).

This is not to say that widespread sexual favoritism or the perpetration of offensive stereotypes of women through other means can never serve as the foundation for a sexual discrimination claim, on a hostile environment theory or otherwise, by a person of either gender. Cf. Drinkwater v. Union Carbide Corp., 904 F.2d 853, 861 n.15 (3d Cir. 1990) (noting school of thought positing that "a man's hostile environment claim," based on others' sexual relationships, "although theoretically possible, will be much harder to plead and prove" because "men's sexuality does not define men as men in this society"). It is entirely possible that a workplace that discriminates against women may also discriminate against men. See Brown, 257 F.3d at 254-55 ("[T]here might even be circumstances that are actionable under Title VII when both men and women suffer sexually discriminatory harms in the same workplace, but for different reasons."). This may occur, for example, if the sexualized atmosphere of the workplace created a hostile environment for women by making submission to the sexual advances of their male supervisors a condition of employment and discriminated against men by foreclosing job benefits

---

has the Court found any, in which such a claim by a male plaintiff was sustained.

16

reserved for compliant women.  As noted above, Krasner does not allege that the widespread favoritism hindered men from advancing at HSH.

Krasner's complaint, of course, is not entirely founded on a general altruistic concern for the well-being of women, and his injuries run deeper than simply taking offense at the manifestation of the perceived stereotyping of women.  And "evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment," Leibovitz, 252 F.3d at 190.  Even claims of harassment against those of the opposite gender may "contribute to the creation of an actionably hostile work environment," but only "to the extent" that this conduct "reveal[s] . . . hostility toward [plaintiff] . . . *on account of [his] sex*."  Brown, 257 F.3d at 255.  Such is not alleged here, however, and Krasner's claim fails because "none of the alleged acts of harassment committed directly against [Krasner]" – either when viewed in isolation or in conjunction with any potential discrimination against women – "support a claim that [he] is being harassed because he is a *male* employee."  Stoner, 2002 WL 523270, at *21.

The primary animator of the complaint is what Krasner terms the "egregious effects of Kiser's favoritism" towards Campfield upon plaintiff himself.  (P. Mem. 9.)  These include permitting Campfield's insubordination through text messaging on company devices; asking Campfield to organize a company golf outing when he (and Colamaria) were ordinarily responsible for organizing this type of event; berating him for telling Campfield she could not organize the golf outing, when in fact he had, in the end, accepted assigning Campfield to plan the event; accusing him of creating "turbulence" in the department and asserting that he was the "laughing stock of the company"; stripping him of substantial responsibilities; requiring him to meet with Kiser under the supervision of in-house counsel; forcing him to undergo "humiliating"

17

scrutiny of his work product; expanding an internal audit to include departments under his control; and, Krasner believes, ultimately being terminated.  (Id. 9-10.)

Assuming that these actions, taken together, systematically and pervasively altered the conditions of Krasner's working environment sufficiently to satisfy the objective component of a hostile environment claim, the claim must nevertheless fail because the complaint does not allege that these incidents are in any way related to his gender.  Krasner does not allege, and proffers no facts that remotely suggest, that a female supervisor in his position would not have experienced exactly the same consequences from Kiser's preferential treatment of Campfield.  Nothing in the facts alleged plausibly connects any of the actions taken against Krasner to his sex.[8]

A fair consideration of the harassment Krasner alleges he suffered demonstrates why courts – including the Second Circuit – routinely reject discrimination claims based on "paramour preference."  In DeCintio v. Westchester County Medical Center, 807 F.2d 304 (2d Cir. 1986), the Second Circuit rejected the sexual discrimination claims of several men who had been denied a promotion in favor of their supervisor's female paramour.  In rejecting the men's claims, the court explained that Title VII's proscription of sexual discrimination is limited to

_____

[8]  Indeed, Krasner also alleges – in an attempt to bolster the overall egregiousness of Kiser's actions – that Colamaria too was a victim of Kiser's favoritism of Campfield.  Kiser, it is alleged, twice favored Campfield over Colamaria in assigning tasks ordinarily handled by Colamaria to Campfield.  (P. Mem. 9; Compl. ¶¶ 25, 30.)  Far from supporting Krasner's discrimination claim, however, the fact that Colamaria, who is female, was also adversely impacted by Kiser's paramour preference supports the conclusion that Krasner was not discriminated against because of his sex.  The same is true with respect to the woman who was denied a laptop and separate office.  For, although "the inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved," "in the absence of evidence suggesting that plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex." Brown, 257 F.3d at 253-54.

gender-based discrimination.  Id. at 306-07; see also id. at 306 (rejecting interpreting the word

"sex" in Title VII to include "sexual liaisons" and "sexual attractions" as "wholly unwarranted").

Under this standard, the supervisor's "conduct, although unfair, simply did not violate Title VII.

[Plaintiffs] were not prejudiced because of their status as males; rather, they were discriminated

against because [the supervisor] preferred his paramour."  Id. at 308.  See also, e.g., Schobert v.

Illinois Dep't of Transp., 304 F.3d 725, 733 (7th Cir. 2002) ("Title VII does not . . . prevent

employers from favoring employees because of personal relationships.  Whether the employee

grants perks to an employee because she is a protegé, an old friend, a close relative or a love

interest, that special treatment is permissible as long as it is not based on an impermissible

classification."); Womack v. Runyon, 147 F.3d 1298, 1300 (11th Cir. 1998) (per curiam) (finding

that "Title VII does not encompass a claim based on favoritism shown to a supervisor's

paramour" and noting that "the great majority of courts which have  addressed this question have

reached the same result").[9]  Krasner's claim is even weaker than DeCintio's because Krasner was

not a similarly-situated employee who was dispreferred in favor of Campfield.

_____

[9] Krasner attempts to distinguish DeCintio on the grounds that it did not involve a claim
of sexual harassment.  (P. Mem. 9 n.6.)  The proposed distinction is artificial, for the relevant
consideration – that to violate Title VII, any discrimination, be it via harassment or otherwise,
must be on account of sex – is constant throughout the range of Title VII discrimination
jurisprudence.  Indeed, in rejecting DeCintio's effort to expand Title VII's definition of "sex" "to
include an ongoing, voluntary, romantic engagement," DeCintio noted that all Title VII claims –
including sexual harassment claims – require a "causal connection between the gender of the
individual or class and the resultant preference or disparity."  DeCintio, 807 F.2d at 307 (internal
citations omitted).  DeCintio left open whether a coercive sexual relationship could create a
hostile work environment for others, by making sexual favors a condition to receipt of benefits.
Id. at 307, discussing Toscano v. Nimmo, 570 F. Supp. 1197 (D. Del. 1983).  But, where, as here,
the relationship alleged is entirely consensual, the preference bestowed on a paramour is akin to
nepotism and does not discriminate on account of gender.  Compare EEOC Policy Guidance on
Sexual Favoritism Example 1 with Example 2.

19

Krasner cites <u>Calder v. Planned Cmty. Living, Inc.</u>, No. 93 Civ. 8882, 1995 WL 456400 (S.D.N.Y. Aug. 2, 1995), for the proposition that a single paramour relationship can create a hostile work environment. (P. Mem. 11.) The plaintiff in <u>Calder</u> was accused of insubordination after she sought to investigate alleged misconduct by her supervisor's paramour, and was fired when she refused to resign. <u>Id</u>. at *2. The court denied defendant's motion for summary judgment on plaintiff's third party sexual harassment claim, finding triable issues of fact as to whether this relationship created a "sexually-biased work environment which prevented plaintiff from doing her job." <u>Id</u>. *8. In reaching this result <u>Calder</u> found the principle of <u>DeCintio</u> inapplicable because the paramour preference did not merely manifest itself through favoritism of the paramour, but actively altered the terms and conditions of plaintiff's employment by preventing plaintiff from doing her job. <u>Id</u>. Although purporting to distinguish <u>DeCintio</u>, <u>Calder</u> did not explain how plaintiff was potentially subjected to a "sexually-biased environment" within the meaning of Title VII – that is, an environment biased on the basis of gender rather than "sexual attractions" or "sexual liaisons." This Court finds <u>Calder</u> unpersuasive in its elevation of the objective hostility component of a hostile environment claim to the exclusion of the prohibited causal factor requirement, and notes that <u>Calder</u> has not been followed in this regard. Simply because the challenged conduct in this case – principally, the alleged office romances – "touched on matters of sexuality," does not mean that the conduct constituted a form of sex discrimination. <u>Brown</u>, 257 F.3d at 256. Rather, as in <u>Brown</u>, Krasner's claim fails because the "hostility toward [him] was grounded in workplace dynamics unrelated to [his] sex." <u>Id</u>. Even if Krasner's disapproval of Kiser's "affair was the true animus behind [the harassment], it was a motivation that did not rely upon [Krasner's] gender and, as such, it [is] not within the ambit of

20

Title VII's protections." <u>Ellert v. Univ. of Texas</u>, 52 F.3d 543, 546 (5th Cir. 1995) (emphasis omitted).[10]

In the absence of an objectively hostile environment oppressing Krasner because of *his* sex, his discrimination claim must be dismissed. It is well established that Title VII "does not set forth 'a general civility code for the American workplace,'" <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006), quoting <u>Onacle</u>, 523 U.S. at 8, but rather is limited to the prevention of discrimination based on gender (or other protected characteristics). The prohibited causal factor requirement plays a critical role – in conjunction with the other elements of a hostile environment claim – in ensuring that "the federal courts [do not] become a court of personnel appeals." <u>Alfano</u>, 294 F.3d at 377. "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." <u>Id</u>. Thus,

_____

[10] The sole allegation from which a logical inference could be drawn that the objectionable conduct would not have occurred had Krasner been female is that concerning the strip club. It is clear, however, that this single incident in which he was forced to observe Kiser indulging himself with strippers falls short of the requisite level of objective severity to be actionable. <u>See</u>, <u>e.g.</u>, <u>Aulicinio v. New York City Dep't of Homeless Servs.</u>, 580 F.3d 73, 82-83 (2d Cir. 2009); <u>Alfano</u>, 294 F.3d at 374 (to meet the objective threshold, generally, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive" (internal quotation marks omitted)). This event may have made Krasner uncomfortable and "extremely offended," but the incident was not plausibly so severely as to alter the terms of his employment and result in an actionable hostile environment. <u>E.g.</u>, <u>Meritor Sav. Bank</u>, 477 U.S. at 67 ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (internal quotation marks and punctuation omitted); <u>Alfano</u>, 294 F.3d at 374 (requiring isolated acts to be "extraordinarily severe" to alone surmount the objective threshold, and citing, as examples of situations in which this high standard could be met, a single sexual assault or the vile and sexually explicit verbal abuse of a female challenging her competence in front of large group of employees, including the victim's subordinates).

although Krasner's work environment may have been unpleasant – even "hostile" in ordinary

parlance – his discrimination claim must be dismissed because the circumstances do not permit

an inference that "[]he was singled out for mistreatment because of [his] sex." Id. at 375; see

also Greogry, 243 F.3d at 694 (requiring an "allegation of factual circumstances that permit the

inference that plaintiff was subjected to a hostile work environment because of [his] sex" in order

to survive a motion to dismiss).  Krasner's allegations reveal that "[]he happened to be a []male

victim of 'equal opportunity harassment,' and not, as required for Title VII liability, someone

who experienced workplace harassment because of [his] sex."  Brown, 257 F.3d at 251

(upholding, in this regard, district court's grant of summary judgment to employer).  As a result,

the Title VII discrimination claim (Count One) must be dismissed.

## III.    Title VII Retaliation Claim

Title VII also contains an anti-retaliation provision forbidding "discriminat[ion] against"

an employee for "oppos[ing] any practice made an unlawful employment practice" by Title VII.

42 U.S.C. § 2000e-3(a).  Unlike the substantive anti-discrimination provision, which "seeks to

prevent injury to individuals based on who they are, i.e., their status[,] [t]he anti-retaliation

provision seeks to prevent harm to individuals based on what they do, i.e., their conduct."

Burlington Northern, 548 U.S. at 63.  Thus, "[e]ven if an employee is not the victim of prohibited

discrimination, Title VII protects [the employee] against retaliation for protesting against such

discrimination," Galdieri-Ambrosini, 136 F.3d at 285, because "[u]nlike the harassment claim,

[plaintiff's] discriminatory retaliation claim may succeed on a theory that the defendants

terminated him for reporting discrimination against others, because the act of reporting is

statutorily protected," Smith, 148 F. Supp. 2d at 311.

To state a retaliation claim, a plaintiff must plead facts tending to show that (1) plaintiff engaged in a protected activity; (2) the employer was aware of plaintiff's protected activity; (3) plaintiff suffered an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse action. Patane, 508 F.3d at 115; Gregory, 243 F.3d at 700. There is no dispute that Krasner has adequately pled the third and fourth elements: Krasner alleges that he suffered adverse employment actions, at a minimum, both in the form of a significant reduction in job responsibilities and his ultimate termination, see Patane, 508 F.3d at 116, and the complaint gives rise to a fair inference of a causal connection between the adverse actions and his internal complaints, see Treglia v. Town of Manlius, 313 F.3d 713, 720-21 (2d Cir. 2002). Whether Krasner engaged in, and whether HSH was aware of, protected activity are more problematic.

To be protected activity, "the plaintiff need not establish that the conduct []he opposed was actually a violation of Title VII." Galdieri-Ambrosini, 136 F.3d at 292; Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). "The law protects employees [who] . . . make[] informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Gregory, 243 F.3d at 700-01 (internal citations and quotation marks omitted). Reasonableness also plays a role in the second element, for "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Galderini-Ambrosini, 136 F.3d at 292; see also Soliman v. Deutsche Bank AG, No. 03 Civ. 104, 2004 WL 1124689, at *13

(S.D.N.Y. May 20, 2004).

Krasner now contends, in his complaint in the present action, that various actions of Kiser and other male managers created an intolerable workplace for women. Because complaints by third parties about discrimination are protected, even though this alleged "bordello" atmosphere did not discriminate against Krasner, he would still be entitled to complain about an environment that discriminated against women without being fired, or otherwise being subjected to adverse employment actions, in return. Prior to his termination, however, Krasner did not complain about such an environment, or about anything that he characterized, or that reasonably could be characterized, as sex discrimination. Rather, Krasner admits that all of his pre-termination complaints – both the private remonstrations with Kiser and the subsequent verbal and written complaints to the human resources department – addressed only Kiser's affair with Campfield, which he characterized as a violation of HSH's ethics policy, and the detrimental effects of this relationship on Krasner and on the department. (P. Mem. 3-4.)

As discussed above, supra Pt. II, the law is clear that preferential treatment of a paramour is not unlawful because it does not discriminate against anyone on account of his or her gender. E.g., DeCintio, 807 F.2d at 308. Krasner argues that he nevertheless had a subjective good faith belief that the conduct he complained of was discriminatory, and that this is all that is required. Krasner's own characterization of his internal complaints, however, is entirely gender-neutral. Krasner consistently describes his complaints, both to Kiser and to HSH's human resources department, as expressing concern that Kiser's behavior "could have a detrimental effect on the Department" and violated Kiser's "duty of loyalty to the institution and presented a conflict of interest." (Complt. ¶ 20 (repeated complaints to Kiser directly); see also id. ¶¶ 41, 48 (verbal and

written complaint to human resources that Kiser was "creating an unprofessional environment" and violating HSH's "ethics policy by creating a personal conflict of interest").).

An examination of Krasner's eight-page written complaint to the human resources department only underscores this point. (See Karnosfky Decl. Ex. C.)[11]  At no point does it express any concern over gender-based discrimination, either against himself or against women. Rather, Krasner simply recounts various ways in which he believed Kiser was "bullying" him (e.g., accusing him of running a dysfunctional and turbulent department, stripping him of responsibilities) and favoring Campfield over him and Colamaria (e.g., text messaging, trip to Germany, organization of marketing meeting and golf outing, restructuring department to give her a more prominent role).  (Id.)  Indeed, Krasner's concern in lodging the complaint is expressly articulated not as a protest against gender-based discrimination, but as an effort to stop Kiser from mistreating Krasner.  (Id. at 3 ("If I didn't act and formally register my concern, there is no doubt in my mind that this treatment towards me would continue.").)

But even giving Krasner the benefit of the doubt, and assuming, arguendo, that he genuinely possessed a reasonable belief that he was complaining of unlawful gender discrimination, the retaliation claim flounders on the fact that HSH had no way to understand his complaints as such.  While Krasner's own legal naiveté may have confused him regarding the potential for Title VII liability for the sort of paramour preference he complained of (see P. Mem. 7), the same cannot be said for HSH, a sophisticated business entity.  Nor would the conduct Krasner complained of have reasonably put HSH on notice that Krasner was complaining of a

_____

[11]  Although this document is not attached to the complaint, Krasner's relies on it in bringing this action, rendering the document "integral" to the complaint and properly considered on a Rule 12(b)(6) motion to dismiss.  See Mangiafico, 471 F.3d at 398.

broader sexual favoritism problem, or a general atmosphere in which women were viewed as "sexual playthings" permeating its New York office. Although the effects of Kiser's favoring of Campfield may have run deep, nothing on the face of such favoritism advances a demeaning view of women. Rather, the overall content and context of Krasner's internal complaints suggest, at most, a consensual affair that – while perhaps unfair, bad for morale, and detrimental to the department and the company – in itself harmed no one on account of a protected characteristic.[12]

Krasner is correct that he need not have explicitly used the words "discrimination" or "gender" to afford his complaints protected-activity status. See Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). When the conduct complained of, however, does not lend itself to a reasonable inference of unlawful discrimination, such "magic words," see Ramos v. City of New York, No. 96 Civ. 3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997), may be the only way to put the employer on notice that the employee believes himself to be complaining of discriminatory conduct. Here, given the gender-neutral conduct Krasner actually complained of, "because [he] failed to couch [his] complaint in terms of gender discrimination, 'there was nothing in [his] protests that could reasonably have led [HSH] to understand that gender was the nature of [his] objections.'" Marks v. Nat'l Commc'ns Ass'n, Inc., 72 F. Supp. 2d 322, 338 (S.D.N.Y. 1999), quoting Galderini-

---

[12]  The situation could be different if Krasner's complaints suggested that the relationship was not, in fact, consensual because in that case, there would be a possibility that Campfield herself was being sexually harassed. In such a case, the "relationship" itself could be discriminatory on account of Campfield's gender and complaining about it could be protected activity. At no point, however, does Krasner ever suggest this situation, nor would his internal complaints have put HSH on notice that Krasner may have thought this type of discrimination to be occurring.

Ambrosini, 136 F.3d at 292.  Krasner's retaliation claim thus fails because any adverse

employment actions that befell him – while quite plausibly a product of Kiser's displeasure with

Krasner for complaining about him – could not have been undertaken in retaliation for any

protected activity.  Soliman, 2004 WL 1124689, at *13 ("Because [the defendant] would not

have understood that [the plaintiff's complaints] had anything to do with sexual harassment,

[any] subsequent retaliation cannot, as a matter of law, amount to an unlawful retaliation under

Title VII.").  Accordingly, the Title VII retaliation claim (Count Two) will be dismissed with

prejudice.

## IV.    Remaining Claims

Krasner also asserts a number of claims under New York State and New York City law.

First, under the NYSHRL and NYCHRL Krasner asserts claims against both HSH and Kiser for

discrimination and retaliation, and against Kiser alone for aiding and abetting HSH's

discrimination and retaliation.  Second, against HSH alone, Krasner asserts common law claims

for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust

enrichment and quantum meruit, plus a claim under the New York Labor Law, stemming from

Krasner's termination and failure to receive a bonus.

Diversity jurisdiction not being present here, this Court may, in its discretion, exercise

supplemental jurisdiction over state law claims that are so related to a party's federal claims that

"they form part of the same case or controversy."  28 U.S.C. § 1367(a).  "In general, however,

'where the federal claims are dismissed before trial, the state claims should be dismissed as

well.'"  Virgona v. Tufenkian Import-Export Ventures, Inc., No. 05 Civ. 10856, 2008 WL

4356219, at *11 (S.D.N.Y. Sept. 23, 2008), quoting Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d

Cir. 1998); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims."); Menes v. City Univ. of N.Y. Hunter Coll., 578 F. Supp. 2d 598, 620 & n.18 (S.D.N.Y. 2008) (dismissing NYSHRL and NYCHRL claims after dismissal of all federal claims, including parallel Title VII claim). The only federal claims having been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining claims. Krasner's claims under New York State and New York City law (Counts Three through Thirteen) are therefore dismissed, without prejudice to reasserting them in state court.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the complaint (Docs. ## 5, 7) are granted. Counts One and Two are dismissed for failure to state a claim. Counts Three through Thirteen are dismissed for lack of jurisdiction, without prejudice to their reassertion in state court.

SO ORDERED.

Dated: New York, New York
     January 7, 2010

                                         GERARD E. LYNCH
                                     United States Circuit Judge